## COMMISSIONER, BALTIMORE CITY POLICE DEPARTMENT *v.* CALVIN CASON

[No. 421, September Term, 1976.]

*Decided February 1, 1977.*

The cause was argued before GILBERT, C. J., and POWERS and DAVIDSON, JJ.

*Millard S. Rubenstein, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellant.

*Karl H. Goodman* and *Lee Gordon,* with whom were *Gordon* & *Goodman, P.A.* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

This case entered the judicial arena when Calvin Cason filed in the Baltimore City Court an Order for Appeal from an order of Donald D. Pomerleau, as Commissioner of the Baltimore City Police Department, which terminated Sgt. Cason's services with the Department. The Order for Appeal was followed by the required Petition. Thus Sgt. Cason invoked his right to judicial review of the administrative actions in the Department which led to his dismissal.

The prelude to the appeal to the Baltimore City Court is found in two charges preferred in August 1974 against Sgt. Cason by Frank J. Battaglia, Deputy Commissioner, Operations Bureau, of the Police Department. The charges alleged violations of the Rules and Regulations for the government of the Police Department of the City of Baltimore.

Charge No. 1 alleged violation of Rule I, Section 5. It set out the section:

"Members of the department shall refrain from making personal contacts with persons of questionable character, or visiting places suspected of violating the law, unless necessary to do so in the performance of their duty."

The specification of the violation stated:

"For that Sergeant Calvin M. Cason did make personal contacts with one Milton K. Roy, a person of questionable character due to his involvement in violations of the lottery laws of Maryland, such personal contacts not necessary to be made in the performance of his police duty."

Charge No. 2 alleged two violations of Rule I, Section 30. It set out the section:

"No compensation, reward, gift, or other consideration shall be solicited or accepted by

members of the department without special permission of the Police Commissioner. Attention is directed to Section 552 of the City Charter, 1949 edition: 'Any monies received as a gratuity or extra compensation for any services which he may render, and which are not turned into the possession of the Police Commissioner by the officer receiving same and applying same to his own use, will be cause for dismissal from the force, and he shall be forever ineligible to any position in the force.' "

Specification 1 said:

"For that in or about the month of January 1973, and/or in months prior thereto, Sergeant Calvin M. Cason did accept United States currency from Milton K. Roy (aka James M. ('Brother') Roy) without the special permission of the Police Commissioner."

Specification 2 said:

"For that in or about the month of January 1973, and/or in months prior thereto, Sergeant Calvin M. Cason did accept United States currency from Sergeant Robert E. Spangler of the Western District, without special permission of the Police Commissioner."

A disciplinary hearing was convened on 21 January 1975 before a Departmental Board consisting of Major William F. Rochford, Chairman, Captain Donald E. Einolf, and Lieutenant Stephan Timchula. Sgt. Cason and the Police Department were represented by counsel. After several preliminary matters were considered, the hearing was continued to a date to be set. It was reconvened on 8 April 1975. Evidence was completed, and the Board made a finding of guilt and finding of fact on each specification, and set out its conclusion and recommendation. They were summarized

in a report made by the Board to the Police Commissioner dated 9 April 1975. Its findings of fact were:

On Charge 1

"Based on the testimony from James M. ('Brother') Roy (aka Milton K. Roy) that he had met with Sergeant Calvin Cason on at least three separate occasions and paid him sums of money to be safe to operate his number operation in the Western District. Roy identified Sergeant Cason without hesitation and related that he gave the money to Sergeant Cason in his hand."

On Charge 2, Specification 1

"Based on the testimony from James M. ('Brother') Roy (aka Milton K. Roy) that he had met with Sergeant Calvin Cason on at least three separate occasions and paid him sums of money to be safe to operate his number operation in the Western District. Roy identified Sergeant Cason without hesitation and related that he gave the money to Sergeant Cason in his hand. The personnel jacket of Sergeant Cason was introduced into evidence by Mr. Rubenstein to indicate that the Police Commissioner had not granted permission to Sergeant Calvin Cason to accept monies or extra compensation for services which Sergeant Cason had rendered."

On Charge 2, Specification 2

"Testimony received from Sergeant Robert E. Spangler, retired, Western District, that he paid sums of money to Sergeant Calvin Cason in the men's room and hallway at the Western District on separate occasions during the period of June 1972 to November 1972 to protect the gambling operation of Harvey Robinson."

The Board stated as a conclusion:

> "The Board recognized the defense's contention regarding one man's word against another and that one would tend to nullify the other; however, the collective testimony of James M. ('Brother') Roy (aka Milton K. Roy) and Robert Spangler provided sufficient weight for the Board to find a preponderance of proof and a finding of guilty."

It recommended "that Sergeant Calvin M. Cason's services with the Baltimore Police Department be terminated."

The Police Commissioner, Donald D. Pomerleau, took action on 14 April 1975, as evidenced by Personnel Order 362-75, dated 15 April 1975. The order recited the findings and recommendation of the Trial Board, and concluded:

> "In the foregoing case of Sergeant Calvin M. Cason the recommended action of the Trial Board is approved. It is hereby ordered that Sergeant Calvin M. Cason be and is hereby terminated from the Baltimore Police Department effective April 14, 1975."

Sgt. Cason's appeal to the court followed.

From the inception of the proceeding to its final conclusion Sgt. Cason was and is entitled to the safeguards provided for in Code, Art. 27, §§ 727-734, known as the Law-Enforcement Officers' Bill of Rights, and Code, Art. 41, §§ 244-256A, Administrative Procedure Act.[1] Moreover, the disciplinary power within the Police Department could be exercised only in accordance with applicable law. And finally, the procedure for judicial review is governed by Subtitle B of Chapter 1100 of the Maryland Rules, comprising Rules B1-B12.

---

1. The Baltimore City Police Department is a State agency, and appeals from it are governed by the Administrative Procedure Act, Kaufman v. Taxicab Bureau, 236 Md. 476, 204 A. 2d 521 (1964).

We summarize the petition filed in the Baltimore City Court by Sgt. Cason. It alleged that:

1. The power vested in the Police Commissioner as the ultimate decision maker is unconstitutional, and its exercise in this case was unconstitutional because the decision was arbitrary and capricious.

2. The findings of the Trial Board, and the order of the Commissioner thereon, were made upon unlawful procedure; were affected by other error of law; were unsupported by competent, material, and substantial evidence; were against the weight of evidence; were unsupported by the entire record; and were arbitrary and capricious.

3. The Trial Board proceedings constituted double jeopardy in that Sgt. Cason was previously tried and acquitted on criminal charges in the United States District Court, upon the same or substantially the same evidence; and that the doctrine of equitable estoppel barred the use of that evidence before the Trial Board.

We have carefully read the entire transcript of the proceedings before the Trial Board. Testimony in support of the charges was given by former Sgt. Robert E. Spangler and by James M. Roye (sometimes spelled "Roy"). The testimony of each was limited, by an agreement between counsel, to the period from June to November, 1972.

Before discussing the evidence, we restate in simple terms, the charges against Sgt. Cason:

1. Making contacts with Roye, a questionable character.
2. Accepting currency from Roye without permission.
3. Accepting currency from Sgt. Spangler without permission.

Roye testified that he had been in the business of writing numbers. He operated out of an automobile repair garage. He had been convicted three or four times in Baltimore City for writing numbers. He said he knew Sgt. Cason, and identified him. He said that in 1972 Sgt. Cason came to his garage, said he was the new sergeant, and wanted to know the date the payroll came down. He said he answered that it

was usually the 15th, or it might be one or two days late when the boys send the money down. Roye said the money was to operate the numbers game, that he was paying Western District to operate, to be safe to write numbers. Roye testified that he gave money to Sgt. Cason three times, and after that another officer came down "for the bundle." He said that when Sgt. Cason came he was in uniform, and in a police car, and "would pull up a little ways". He said that he paid Sgt. Cason $50. — "that was him alone" — and "when he got the bundle he got $245."

There was much evidence tending to cast doubt on Roye's credibility. He was an admitted bribe-giver, a law violator, and a convicted criminal. He had been arrested by the F.B.I., and thereafter had cooperated with them. He testified for the government in the trials of several police officers, including Sgt. Cason, on criminal charges. There were some inconsistencies, although not necessarily untruths, in his testimony. He may have had reason to give false testimony.

Spangler testified that he received money about once a month from Harvey Robinson, who was in the numbers business, to protect his gambling operation. Some of the money, Spangler said, was for himself, and some was for other members of the District. He testified that he gave Sgt. Cason $70. approximately three times during that period, because he was instructed to do so by Harvey Robinson. He said the money was given either in the men's room or hallway at the Western District.

There was much evidence tending to cast doubt on Spangler's credibility. He was an admitted bribe-taker, and an admitted liar. He had been arrested by the F.B.I., and thereafter had cooperated with them in attempting to gather evidence against other members of the Baltimore City Police Department. He had retired from the Department, apparently with full pension rights. He had testified for the government in the United States District Court trials of several other officers on criminal charges. He was also charged, but received probation. He may have had reason to give false testimony.

Special Agent Masterson of the F.B.I. testified, and

described the cooperation of Spangler and Roye with the F.B.I. investigation. He gave no substantive evidence.

Sgt. Cason called ten members of the Police Department as witnesses. Several, who had worked under Sgt. Cason, testified that he never told them to stay away from any gambling operation. Two, who apparently had been accused by Spangler, testified that Spangler did not pay them any money. Several described a generally hostile relationship between Sgt. Spangler, in Operations, and Sgt. Cason, in Patrol, in the Western District.

Concluding the evidence was Sgt. Cason's own testimony. Asked if, "in the latter part of 1972 did you go to Brother Roye and collect either $50. or $245. three times?", he answered, "I never knew Brother Roye until June when I was indicted." He added that he had seen Roye twice before — when he was investigating hold-ups at a bar. Sgt. Cason was asked, "did you accept money from Sergeant Spangler in connection with Harvey Robinson's gambling operation?" He replied, "I did not. I didn't even know Harvey Robinson." Sgt. Cason also brought out that he was charged in the Federal Court on the testimony of Roye, and that the outcome was "not guilty". He said that Spangler was not what you would call a working sergeant, but was actually a statistical clerk, and went around the police station like he owned it.

The appeal in the Baltimore City Court was submitted to Judge Basil A. Thomas on the record, with written and oral arguments of counsel. A partial transcript of the proceedings before Judge Thomas contains only his oral opinion, in which he summarized the case and the evidence, and stated his findings and conclusions. On 19 March 1976 Judge Thomas signed an order, filed on 22 March 1976, reversing the order of the Police Commissioner, and directing that Sgt. Cason be reinstated, with full rank and full pay, dating from his suspension. The Police Commissioner appealed to this Court from that order.

In his opinion, Judge Thomas first considered Sgt. Cason's

contention that the power vested in the Commissioner, and its exercise in this case, were unconstitutional. He said:

"The Court finds the Commissioner's procedure and policy was proper and not violative of any constitutional safeguards or due process rights."

In a very recent case involving the dismissal of 55 members of the Baltimore City Police Department, the Court of Appeals, in *Hoyt v. Police Commissioner*, 279 Md. 74, 367 A. 2d 924 (1977) discussed the power of discipline in the Department. It said, at 84-85:

"The lower court was satisfied, as are we, that the power to discipline is vested solely in the Commissioner. Code of Public Local Laws of Baltimore City (1969) § 16-7 (7) and (8) respectively provide that the Police Commissioner is authorized:

'(7) To appoint, promote, reduce in rank, grade or position, reassign, reclassify, retire and discharge all members of the Department in the manner prescribed by law.

'(8) To regulate attendance, conduct, training, discipline and procedure for all members of the Department and to make all other rules, regulations and orders as may be necessary for the good government of the Department and of its members.'

This grant of authority must be considered, however, in conjunction with § 730 (b) of the Law-Enforcement Officers' Bill of Rights, which provides:

'Conduct of hearing — The hearing shall be conducted by the investigating committee of the law-enforcement agency by which the law-enforcement officer is employed. Both the law-enforcement agency and the law-enforcement officer

shall be given ample opportunity to present evidence and argument with respect to the issues involved. Both may be represented by counsel.'

"Here, the Commissioner was faced with two requirements: that of performing the duty of the ultimate decision maker imposed upon him by law, and of performing it in a fair and impartial manner. As the court below found, the Commissioner chose not to exercise the investigative function which was performed by the unit headed by Deputy Commissioner Glauser or the prosecutorial function which was performed by the Attorney General, but to act only in an adjudicative role. The Commissioner isolated himself by directing that the Deputy Commissioner initiate the investigation, convene the Boards and supervise the preparation of charges. The Commissioner's only function was that of accepting, modifying or rejecting the punishment recommended."

The authority of the Police Commissioner to promulgate rules and regulations was discussed in a somewhat different aspect by the Court of Appeals in *Beca v. Mayor and City Council of Baltimore*, 279 Md. 177, 367 A. 2d 478 (1977).

Judge Thomas correctly rejected the attack upon the constitutionality of the disciplinary power vested in the Police Commissioner, and the manner in which it was exercised.

The trial judge then stated what he considered to be the question before the court. He said:

"The question is, are the findings of fact of the Hearing Board supported by substantial evidence?

"I am aware of the test of substantial evidence. The Court should not substitute its judgment on the question of whether the inference drawn by the Hearing Board is the right one or whether a different inference would have been better

supported. The test is reasonableness, not rightness."

In discussing the testimony, Judge Thomas expressed the belief, erroneously, we think, that the charges against Sgt. Cason "rise or fall on the strength of the evidence offered in support of the third charge." He commented that it was solely because of Spangler's accusation that the third charge was brought, and that charge resulted in bringing disciplinary proceedings on the first two charges as well.

Saying that the only evidence against Sgt. Cason was Spangler's uncorroborated testimony, Judge Thomas concluded:

> "Is this testimony, standing naked and alone, of an admitted grafter, who had previously given false statements to the police, uncorroborated in any detail, vague as to specific dates, and other particulars, of one who had no particular relationship with Sergeant Cason, sufficient to overcome the denial of Sergeant Cason, a police officer, with an unblemished record of 19 years of service, the recipient of 29 commendations, and who apparently had the respect of the men working with him?
>
> "The Court considers the position of a police officer a valuable property interest that can only be terminated by a fair hearing based on substantial evidence.
>
> "Now, while this Court is always reluctant to substitute its judgment for that of the administrative body that makes the decision, that decision, however, must be based on substantial evidence, that is, such as a reasonable mind might accept as adequate to support a conviction. The Court finds that the evidence in this case was less than substantial * * *."

It is quite apparent that the trial judge found Spangler's evidence to be "less than substantial" because he believed

Sgt. Cason's denial, and did not believe Spangler. It appears, also, that the judge's failure to consider Roye's evidence at all arose indirectly from an issue raised by Sgt. Cason before the Trial Board, and again in the Baltimore City Court.

At the outset of the hearing before the Trial Board, Sgt. Cason filed a written motion, grounded on the doctrine of collateral estoppel, to exclude the testimony of Roye, Spangler, and other persons. The supporting memorandum said that those persons testified against Sgt. Cason in two federal criminal trials concerning Roye's gambling operation, and in those trials the jury found Sgt. Cason not guilty of conspiring to facilitate the conduct of illegal gambling. The Trial Board denied the motion, and heard the evidence.

In the petition filed in the Baltimore City Court, the question was raised again, alleged in terms of double jeopardy and collateral estoppel. It was fully argued in the memorandum of law filed in the Baltimore City Court. Judge Thomas, in his opinion, said that he found the questions of res judicata and collateral estoppel inapplicable. After that finding, however, the judge discussed only the third charge, the one to which Spangler's testimony was directed. He did so, apparently because of a statement made in argument by counsel for the Commissioner. Counsel said that the Police Department would not have brought the first two charges [relating to James M. Roye] unless they had additional information relating to the Harvey Robinson incident.

Within the proper limitations upon the scope of judicial review, the court should have considered the entire record.

The scope of judicial review of the actions of administrative bodies has been discussed and explained in numerous cases. Principles which have been repeated time and again were stated by the Court of Appeals years ago in *Heaps v. Cobb*, 185 Md. 372, 45 A. 2d 73 (1945). That case questioned the legality of the refusal of the Board of Trustees of the Employees' Retirement System of Baltimore City to grant a claim for accidental death benefits. In the absence of a statutory provision for appeal, the Court, on

petition for a writ of mandamus, reviewed the Board's action. The Court said, at 378-79:

> "Administrative boards in general may be said to act in a quasi judicial capacity insofar as they have the duty to hear and determine facts and, *based on them*, to make decisions. Moreover, such decisions carry with them the presumption of validity and, where the statute or ordinance provides for an appeal to the courts, will not be disturbed on review if the record shows substantial evidence to sustain the findings."

The Court quoted the general rule. It said, at 380:

> "The doctrine is well illustrated in the review of this subject by Professor McGovney, of the University of California, in these words: 'The general rule with respect to nearly all Federal administrative agencies and those of other states is that their findings of fact are final if there is substantial evidence to support them. With respect to the issues of fact, the reviewing court examines the evidence taken by the administrative agency, not to re-weigh it, not to substitute the Court's judgment for that of the agency, but to determine whether the agency acted rationally, that is to say, that it did not arrive at its conclusion arbitrarily.' *Cal. L. R.* (1942) Vol. 30, 509."

A very clear summation of the scope of judicial review was written by Chief Judge Hammond for the Court of Appeals in *Insurance Commissioner v. National Bureau*, 248 Md. 292, 236 A. 2d 282 (1967).[2] The Court said, at 309-10:

> "Whichever of the recognized tests the court uses — substantiality of the evidence on the record as a

---

2. For an analysis of this and other decisions involving judicial review of administrative action, see the excellent article by Professor Edward A. Tomlinson, Constitutional Limits on the Decisional Powers of Courts and

whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record — its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment."

In the much more recent case of *Dept. of Natural Resources v. Linchester*, 274 Md. 211, 334 A. 2d 514 (1975), Judge Digges, for the Court of Appeals, discussed primarily the line of separation between administrative action and the judicial power. Regarding the function of administrative agencies, the Court said, at 222:

"These agencies are created in order to perform activities which the Legislature deems desirable and necessary to forward the health, safety, welfare and morals of the citizens of this State. While these agencies at times perform some activities which are legislative in nature and thus have been dubbed as quasi-legislative duties, they in addition take on a judicial coloring in that

---

Administrative Agencies in Maryland, 35 Md.L.R. 414. Referring to Insurance Commissioner v. National Bureau, *supra*, Prof. Tomlinson says:

"The Maryland Court of Appeals has nevertheless striven mightily to achieve a uniform approach to judicial review of administrative action. The hallmark of this approach has been that a reviewing court should not 'itself make independent findings of fact or substitute its judgment for that of the agency.' "

frequently, within the exercise of their power, they are called upon to make factual determinations and thus adjudicate, and it is in that sense that they are also recurrently considered to be acting in a quasi-judicial capacity. This dual role which administrative agencies play has long been accepted in this State as being constitutionally permissible."

The Court said further, at 223-24:

"While administrative agencies, in the proper performance of duties which the Legislature permissibly delegates to them, may use discretion to formulate policy, promulgate rules and adjudicate in order to determine specific questions of fact, they, nevertheless, in doing so are performing nonjudicial functions; on the other hand, the role of the courts in regard to these administrative agency functions is to see that these responsibilities were properly empowered to the agency and have been performed within the confines of the traditional standards of procedural and substantive fair play. In order to perform this essential duty, the courts may be provided with specific authorization to do so by the Legislature through statutory provision, but, even absent such authority, the judiciary has an undeniable constitutionally-inherent power to review, within limits, the decisions of these administrative agencies. *Balto. Import Car v. Md. Port Auth.*, 258 Md. 335, 265 A. 2d 866 (1970); *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 236 A. 2d 282 (1967); *Johnstown Coal & Coke Co. v. Dishong*, 198 Md. 467, 84 A. 2d 847 (1951); *Heath v. M. & C.C. of Baltimore*, 187 Md. 296, 304-05, 49 A. 2d 799 (1946). This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which

may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries (not an issue here); furthermore, when an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner."

Citing and quoting from *Heaps v. Cobb, supra,* and *Insurance Commissioner v. National Bureau, supra,* the Court added, at 225:

"However, just as the administrative agency has constitutional limitations to its power vis-à-vis the courts, so do the courts have constitutional restrictions limiting their oversight of agency decisions. This follows from the fact that the judiciary is constitutionally 'without authority to interfere with any [proper] exercise of the legislative prerogative . . . or with the lawful exercise of administrative authority or discretion.' "

Our consideration of the case before us is based upon the evidence before the Trial Board, not upon the action of the Baltimore City Court, which the appellee, irrelevantly, characterizes as not clearly erroneous. In *Public Serv. Comm'n v. Balto. Gas & El.,* 273 Md. 357, 329 A. 2d 691 (1974), the Circuit Court for Calvert County, on appeal from orders of the Public Service Commission, had reversed the Commission's findings in certain respects. All parties appealed from the decree of the circuit court. Pointing to the presumptive correctness of the Commission's order, the experience of its members and staff, and the focus of judicial review, the Court of Appeals said, at 362:

"We do not, therefore, in considering the legality and reasonableness of the Commission's decision in this case, afford prima facie correctness to the decree of

the court below; nor do we determine merely whether the court abused its discretion in reviewing the Commission's order, as suggested by the Company. We do not directly review the reasonableness of the determinations made by the lower court, but instead consider whether there was substantial evidence before the Commission on the record considered as a whole to support its [conclusions]."

In *Snowden v. Mayor & C.C. of Balto.*, 224 Md. 443, 168 A. 2d 390 (1961), the Court of Appeals said, at 445:

"The judicial function in appeals from an administrative agency is well established and defined. The court will correct illegal actions and those which are arbitrary and unreasonable because they are not based on substantial evidence but it will not substitute its own independent examination of or its own judgment on the facts for those of the agency to which the carrying out of state policy has been delegated."

The Court further said, at 448:

"The heart of the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. 'The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.' Davis, *op. cit.*, Sec. 2905, p. 139."

* * *

"It may be (although we do not so say) that we would have drawn different inferences or conclusions from the evidence, or that we think the

Board's action to have been unfortunate and erroneous, but it is the judgment of the Board, not ours, which controls if reasonable men could have done as the Board did, for, as has been said, the test is reasonableness not rightness."

The Court of Appeals said in *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 84 A. 2d 847 (1951), a workman's compensation appeal, at 476:

"We add that this Court has no authority to set aside an award of the Commission merely because the Court might weigh or appraise the evidence differently. Where the findings of the Commission are supported by inferences which may be fairly drawn from the evidence, even though the evidence may be susceptible of opposing inferences, the Court will not reject those findings."

In *Board v. Oak Hill Farms,* 232 Md. 274, 192 A. 2d 761 (1963), the Court said, at 283:

"Whether the test of substantial evidence on the entire record or the test of against the weight of all the evidence is followed, the courts have exercised restraint so as not to substitute their judgments for that of the agency and not to choose between equally permissible inferences or make independent determinations of fact, because to do so would be exercising a non-judicial role. Rather, they have attempted to decide whether a reasoning mind could reasonably have reached the result the agency reached upon a fair consideration of the fact picture painted by the entire record."

We have read the many cases in Federal and State courts cited in the briefs. In general they demonstrate that the same standards for judicial review of the actions of administrative agencies prevail throughout the country. We shall refer to two of the state court cases.

In *Collins v. Codd,* 342 N.E.2d 524 (N.Y. 1976), the Court of Appeals of New York reversed an Appellate Division

order which had annulled a determination of the Police Commissioner of the City of New York which disciplined a member of the police force upon two charges of misconduct. A woman who was arrested by the officer, and the woman's mother, testified to physical mistreatment of the woman. The officer and two or three other witnesses testified and denied the mistreatment. The Court of Appeals said:

> "There must be a reversal. The testimony posed a clear-cut issue as to the veracity of the witnesses; and where substantial evidence exists, as it clearly does here, to support the administrator's determination, that determination must be sustained, irrespective of whether a similar quantum of evidence is available to support other varying conclusions."

The Court quoted from an earlier case, in which it had said:

> " 'Where there is conflict in the testimony produced * * * where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the [administrative agency]. The courts may not weigh the evidence or reject the choice made by [such agency] where the evidence is conflicting and room for choice exists'."

The Supreme Judicial Court of Massachusetts considered the administrative dismissal of a police officer in *Commissioners of Civil Service v. Municipal Court*, 338 N.E.2d 829 (Mass. 1975). The officer was indicted on Federal charges of conspiracy to forge and utter postal money orders, and of forging and uttering the same. The Boston police commissioner suspended the officer to await the outcome of the criminal prosecution. The officer was acquitted by jury verdict. The commissioner reinstated the officer, and initiated a disciplinary complaint for conduct

unbecoming an officer in violation of departmental regulations. There were two specifications, each charging that the officer associated with a person of known bad character while that person was committing a crime.

After a hearing, apparently before the commissioner, the officer was found guilty, and discharged. Under an applicable statute, there was another hearing by the Civil Service Commission, with the same result. A petition for review was filed in the Municipal Court of Brighton District. There the judge found what he considered to be errors, reversed the commission, and ordered reinstatement of the officer.

The Supreme Judicial Court, on review of the evidence and the proceedings, held that the Municipal Court erred in reversing the commission's decision. The Court said, at 832-33:

> "As to the merits, we think the testimony given by witnesses before the hearing officer supported the subsidiary findings made by that officer and those findings justified the recommendation and decision to discharge. The findings rest on substantial evidence from witnesses * * *."

> * * *

> "It may be surmised that the judge of the Municipal Court misconceived his role in a § 45 review of a decision of the commission. Section 45, as amended through St.1970, c. 711, makes clear by its express terms what the cases had, in effect, earlier established: to reverse the commission's decision on the facts, the judge must find it 'unsupported by substantial evidence' (§ 45[e]). No such finding could properly be made here. The judge may mistakenly have thought himself free to reevaluate the testimony, although even on such a basis it is not easy to see how he could have come out as he did."

With respect to the question of collateral estoppel raised below by Sgt. Cason because of his acquittal on the Federal

charges of conspiracy, a reading of *Ashe v. Swenson*, 397 U. S. 436, 90 S. Ct. 1189, 25 L.Ed.2d 469 (1970), makes it perfectly clear that collateral estoppel, as a part of the Fifth Amendment's guarantee against double jeopardy, had no application to the evidence received by the Trial Board in the present case. The Supreme Court defined the principle as meaning that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. The disciplinary hearing before the Trial Board was not a prosecution by the United States, nor did it involve conspiracy as proscribed by a Federal statute as an issue of ultimate fact.

In the Massachusetts case of *Commissioners of Civil Service v. Municipal Court, supra,* the Court considered a similar question. In disposing of that issue the Court said, at 834:

"It is then suggested that the fact of the respondent's acquittal under the indictment in some way made it legally impossible for the commission to find him guilty of the departmental charge of 'conduct unbecoming.' The point is put in a variety of ways but, however framed, it may be answered in the words of Davis, J., in *Kowal v. United States*, 412 F.2d 867, 870, 188 Ct.Cl. 631 (1969), speaking to a case stronger for the employee than the present case because there the adversaries in the discharge and criminal proceedings were the same: 'The Board [of Appeals and Review of the United States Civil Service Commission] was clearly correct that the decision in the criminal case was not binding upon it as *res judicata*. [Court's omitted footnote cites cases.] While the parties to the criminal and the removal proceedings were the same, the charges, though parallel, were not precisely on all fours and the burden of proof was different — a preponderance (or, perhaps, clear and convincing evidence) in the removal proceeding, beyond a reasonable doubt in the criminal. Since

only a general verdict was rendered, there is no absolute certainty as to how the jury decided specific issues of fact, and collateral estoppel in the strict sense is therefore not warranted either.' "

Extensive quotations from numerous cases dealing with the scope of judicial review have been included in this opinion in order to direct our focus sharply upon the question involved in this case.

A reviewing court may, and should, examine any inference, drawn by an agency, of the existence of a fact not shown by direct proof, to see if that inference reasonably follows from other facts which are shown by direct proof. If it does, even though the agency might reasonably have drawn a different inference, the court has no power to disagree with the fact so inferred.

A reviewing court may, and should, examine any conclusion reached by an agency, to see whether reasoning minds could reasonably reach that conclusion from facts in the record before the agency, by direct proof, or by permissible inference. If the conclusion could be so reached, then it is based upon substantial evidence, and the court has no power to reject that conclusion.

A reviewing court may, and should, examine facts found by an agency, to see if there was evidence to support each fact found. If there was evidence of the fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact.

The Trial Board which heard the charges against Sgt. Cason was not required to infer unproved facts from proved facts. Nor was it required to engage in a process of reasoning from facts to conclusions. Its task was enormously difficult, yet simple. Before the Trial Board was the testimony of Roye, which said, in effect, "Sgt. Cason came to see me, and I gave him bribe money." Spangler's testimony said, in effect, "I gave bribe money to Sgt. Cason." Sgt. Cason said, in effect, "I received no money from either Roye or Spangler. Their testimony is not true."

To believe Roye and Spangler was to disbelieve Sgt. Cason. To believe Sgt. Cason was to disbelieve Roye and Spangler. The issue was credibility, and nothing more. Direct evidence of an ultimate fact may be true, or it may be untrue, but it surely cannot be called insubstantial.

It was the responsibility of the Trial Board, and solely of the Trial Board, to find the true facts by assessing the credibility of the conflicting evidence on those facts.

The Baltimore City Court erred when it substituted its assessment of credibility for that of the Trial Board.

*Judgment reversed.*
*Order of the Police Commissioner*
*reinstated.*
*Appellee to pay costs.*